UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Edward Cunningham,

                    Plaintiff,           CV-03-3522 (CPS)

     - against -             MEMORANDUM
                                     OPINION AND ORDER


Consolidated Edison Inc.,

                    Defendant.

----------------------------------------X


SIFTON, Senior Judge.,

    Plaintiff, Edward Cunningham, commenced this action by
filing a complaint invoking this Court's federal question and
supplementary jurisdiction against defendant, Consolidated Edison
Inc. ("Con Edison").  The complaint sets forth claims for relief
based on race discrimination and hostile work environment, in
violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§2000e *et. seq.* ("Title VII") and the New York State Human Rights
Law, Executive Law §296 *et seq*. ("NYSHRL"), age discrimination
and hostile work environment in violation of the Age
Discrimination in Employment Act of 1967, as amended, 29 U.S.C.
§621 *et. seq.* ("ADEA"), and the New York City Human Rights Law,
N.Y.C. Admin Code §8-101 *et seq*. ("NYCHRL"), and retaliation in
violation of Title VII, NYSHRL and NYCHRL. Defendant Con Edison
now moves for summary judgment dismissing the complaint pursuant

to Federal Rule of Civil Procedure 56. For the reasons set forth below the defendant's motion for summary judgment is granted.

## BACKGROUND

The following facts are taken from the submissions of the parties in connection with the present motion. They are undisputed unless otherwise noted.

Plaintiff Edward Cunningham is a white male, born January 9, 1962. (Amended Complt. ¶14). On January 18, 2000, he commenced his employment with defendant Con Edison as a General Utility Worker ("GUW"). (Id. at ¶15).

<u>Con Ed Procedures For Complaints</u>

Con Ed maintained internal procedures to address employee concerns about environmental, health, and safety issues. These procedures were laid out in its Code of Conduct, which was distributed to every employee.

The Code of Conducts section on environmental, health and safety laws, provided:[1]

> If you have an environmental concern or problem, follow these guidelines:
> First, report the matter to your immediate supervisor .
> . . If you feel uncomfortable raising concerns with
> your immediate supervisor, you can contact your

---

[1] The Code of Conduct had minor modifications during the time of plaintiff's employment. The ellipses and bracketed portions in the quote reflect these changes, which did not alter the process of filing an internal complaint.

Environmental, Health and Safety (EH&S) Manager or your local EH&S representative, or you may call the EH&S Compliance Administrator . . . If you have a more serious concern, including suspected violations of this Code, environmental or health and safety regulations, you can contact the Corporate Ombudsman at (212)-206-0949. The Corporate Ombudsman is overseeing [Con Edison's] ethical and environmental performance on behalf of the Company (see **Reporting Wrongdoing** section on pages 35-27) . . . The Company's Environment, Health and Safety Excellence Program and this Code assure all employees that they will not be subject to retaliation and harassment of any kind for raising a concern or allegation in this area.

("Living Our Values, Your Guide to the Code of Conduct for Consolidated Edison, Inc.," §1.1, Carey Aff. Ex. DD, Dobrini Dec. Ex. C.).

The Code of Conduct and Con Ed's Corporate Policy on Equal Opportunity lay out the process for raising an Equal Opportunity in Employment Complaint. The Code of Conduct states:

Con Edison men and women are fully committed to Equal Employment Opportunity (EEO) for all employees and applicants for employment. We do not discriminate . . . on the basis of race, color, religion, creed, national origin, sex, age, marital status, sexual orientation, disability, citizenship or veteran status. Moreover, sexual or any other form of harassment will not be tolerated . . . . Acts or threats of violence towards employees or any other form of intimidation based on fear of violence, cannot be tolerated. Each reported incident will be promptly investigated and appropriate disciplinary action, up to and including termination of employment, will be taken.

("Living Our Values, Your Guide to the Code of Conduct for Consolidated Edison, Inc.," §1.1, Carey Aff. Ex. DD, Dobrini Dec. Ex. C.). The Corporate Policy States:

> In order to ensure implementation of its EEO policy,
> the Company shall continue to
> . . . Maintain an Equal Employment Opportunity Affairs
> [office or department].
> . . . Accept and investigate, through the Director,
> Equal Employment Opportunity Affairs . . . complaints
> of violations of this EEO policy . . . and implement
> appropriate actions, including discipline . . . for
> violations of [the EEO] policy.

(Id.).

Van Nest Assignment - January 18, 2000 to April 8, 2000

Cunningham was initially assigned to the "Van Nest" facility as part of the Company's Maintenance and Construction Services Department ("M&C").(Carey Aff. Ex. K). At the Van Nest facility Cunningham worked under several supervisors, including Supervisor Robert Colucci.

According to Cunningham, in March 2000 Supervisor Bob Collucci told Cunningham that he was shocked that Cunningham was a new hire and said "you should be an 'A' mechanic at your age." (Cunningham Aff. ¶7). Subsequently, when Cunningham refused to operate a two-hundred ton crane without training, Collucci told Cunningham that Con Edison was used to younger, more aggressive workers. Collucci further told Cunningham, "I think you're not going to last at Con Ed." (Cunningham Dep. 54, 71-74).

On March 10, 2000, Collucci issued an unsatisfactory performance evaluation for Cunningham. The review stated that Cunningham was not "someone who is willing to give a hand unless asked or told to. (Carey Aff. Ex. K.)

According to Cunningham, he complained about Collucci's age based remarks to Pat Boland, an administrative supervisor who reported to General Manager Mike O'Donnell. (Cunningham Dep. 80). Cunningham did not report the comment to the Company's internal Equal Employment Opportunity Affairs Department ("EEO"). (Carey Aff. Ex. DD, ¶10).

On March 24, 2000, Cunningham received a satisfactory review from supervisor Kevin Sweeny. Supervisor Troy Bruce changed this review to a negative review, because Cunningham had not properly cleaned a work station. (Cunningham Dep. 74-5, 88, 91; Carey Aff. Ex. K).

Coal Tar Gang Assignment, Maintenance Services: April 9, 2000 – May 26, 2001

Beginning on April 9, 2000, Cunningham began a year long assignment to the Coal Tar Gang of Maintenance services. This assignment involved removing coal tar insulation from cables in the street. (Cunningham Dep. 94-95).

*Relationship with Supervisor Lew*

Beginning in April of 2000 and continuing through October of that year, Cunningham received weekly job evaluations from Supervisor Lew. On April 18, 2000, Lew commented in his evaluation that, "Ed is very cooperative, is getting the hang of things, assisting in setting up the work site, e.g. traffic control, retrieval unit, manhole entry setup, shows positive attitude." On April 22, 2000, Lew noted in his evaluation, "Ed

is showing good work habits, is cooperative, show [sic] desire to learn." On May 6, 2000, Lew wrote, "Ed is a good worker, dependable, cooperative and accepted by his fellow workers." On May 17, 2000, Lew stated, "Ed is working out good [sic], is cooperative, has a good attitude towards the job." (Pl. Ex. C). Cunningham initially received mostly "satisfactories" on his job evaluation, but his evaluations improved and by October Cunningham was receiving mostly "very good" evaluations. At no time did he receive less than a satisfactory rating. In April 2000, Supervisor Lew promoted Cunningham from General Utility Worker to Mechanic B. (Cunningham Dep. 152). Despite the positive evaluations, Cunningham claims that Supervisor Lew "didn't like [him]" (Cunningham Dep. 121) and that in July, 2000, Supervisor Lew told Cunningham that he was, "too old and overeducated to do this kind of work." (Cunningham Dep. 147).

*Relationship with Co-Workers*

Cunningham claims that during his assignment to the coal tar gang, co-workers made age and race based comments to him. On one instance, Cunningham states, an unidentified co-worker asked him, "what the fuck are you doing here, old man?" (Cunningham Dep. 119).

Cunningham further alleges that during this same period, two employees, Mike Hansel and Carlos Gordon, made derogatory racist remarks to him such as, "why do you have to come into this

company guns blazing like a white boy from Long Island."
(Cunningham Dep. 118; Cunningham Aff. ¶11), and "I was treated
like shit when I came in and that means I get to treat you like
the shit that you are, white boy." (Cunningham Aff. ¶11).
Cunningham also alleges that in December 2000, Hansel demanded
that Cunningham step outside a work vehicle and physically
threatened him. (Cunningham Dep. 116).

*Altercation with Supervisor Tranchina*

In January or February of 2001, Cunningham had an
altercation with supervisor John Tranchina. Cunningham had
previously objected to Tranchina's method of doing work and
instructed Tranchina as to the method he believed was correct. On
the day in question, the coal tar gang was working in a trench
near Columbia University. Tranchina told the work crew, "you guys
get up, you can't eat lunch anymore; we've got to get this
project done." (Cunningham Dep. 215-216). Cunningham says
Tranchina then said to him, "get in the hole, prick." Cunningham
went into the trench as requested but then jumped out because a
backhoe was spilling sand into the hole threatening to dislodge
the supports. (Cunningham Dep. 220-221).

*Altercation with Supervisor Murphy*

On May 4, 2001, Cunningham asked his supervisor, Dennis
Murphy, for what Murphy considered to be an obsolete and
inappropriate respirator. (Lew. Dep. 66). Several of his co-

workers described Cunningham's request as abrupt and confrontational. (Carey Aff. Ex. L). When Murphy began to respond, Cunningham demanded, "just give me a yes or no answer." (Id.) Afterward, Cunningham heard from a co-worker that Murphy had commented, "Ed's going to bury himself here." (Cunningham Dep. 186-87).

*Cunningham's Complaints Concerning the Coal Tar Gang*

According to Cunningham, in May 2001[2] he complained to Con Edison's Corporate Ombudsman, Robert McGuire and Deputy Ombudsman Richard Bagwell that he was experiencing race and age discrimination. (Cunningham Aff. ¶12). The defendant claims that Cunningham's complaints focused on safety issues and management's response to Cunningham's having raised such issues, and made only a passing reference to his age and college education. (Carey Aff. Ex. N). Cunningham requested that his complaints remain confidential. (Cunningham Aff. ¶14). Cunningham claims that Bagwell and McGuire assured him that his complaints would remain confidential. However, Cunningham believes that they did not honor this promise because Supervisor Lew was aware of Cunningham's complaints. (Lew Dep. 35). Further, according to Cunningham, supervisor Marovic told auditors he was aware that Cunningham had sent an e-mail about him to Bagwell.

---

[2]On May 9, 2001 Cunningham spoke with Bagwell on the phone and met with him away from work on May 14, 2001. On May 21, Tabone was assigned to investigate.

Bagwell did not refer any of Cunningham's complaints to the Corporate EEO, but rather, referred them to George Tabone in the Auditing Department. (Bagwell Dep. 18). Tabone told Cunningham that he would refer the matter to the EEO, but Tabone did not do so. (Cunningham Aff. ¶13).

## 16th Street Assignment

On May 27, 2001, Cunningham was transferred to an assignment in the 16th street yard under supervisors Andre Sahai and Joe Busacca. (Cunningham Dep. 108, 103). Defendant claims that Cunningham did not get along with his co-workers at this site. According to Project Manager Massoni, "Cunningham was acting up a little bit and the other employees were not happy to work with him, that all he did was ramble about his dogs . . . that he felt the job was beneath him." (Lew. Tr. 72-73). Cunningham was heard saying to other employees, "I am a white educated man," "what the hell are we doing?" and "this job is stupid." (Id. at 73-74).

*Tuition Reimbursement*

On May 29, 2001, Cunningham was told that he needed a management signature in order to obtain tuition reimbursement for classes he was attending. (Cunningham Dep. 225). This was a general requirement for employees seeking reimbursement. (Id.). Cunningham asserts that his tuition reimbursement was delayed by supervisors Massoni, Murphy, Boland, and Delabastide in

retaliation for his having raised age, race, and safety issues (Id. at 229). Defendant asserts that these supervisors had not been informed of Cunningham's complaints. (Carey Aff. Ex. BB ¶7-9). Defendant also asserts that Bagwell was not made aware of any complaints. (Carey Aff. Ex. X, Bagwell Sec. Aff. ¶3-5).

*Complaints to Tabone*

On June 4, 2001, Cunningham raised several harassment and safety issues in a meeting with Tabone. According to Tabone, none of these issues involved race or age discrimination. (Carey Aff. Ex. BB, Tabone Aff. ¶4). Over the next months Cunningham phoned and e-mailed Tabone to inform him of problems Cunningham felt he was facing. Only one of these e-mails raised an issue Tabone considered EEO related: a co-worker, Gonzalez, made a false accusation in April 2000 that Cunningham had deliberately "opened the stop van back doors on" female co-worker Fleming while she was changing. (Carey Aff. Ex. N). Cunningham did not feel that Gonzalez had been sufficiently punished for lying. (Id). Tabone notified the director of the Company's EEO Affairs Department of this allegation. On August 1, 2001, Cunningham sent Tabone an e-mail complaining that he was being harassed by managers and was worried about being fired. (Pl. Ex. D).

*Cunningham's Late Return and Failure to Check Out*

On June 12, 2001, Cunningham was instructed to work with co-worker Hansel to inspect a manhole. (Cunningham Dep. 110).

Cunningham claims that this work took place during his lunch hour. After the job Hansel and Cunningham were supposed to return to a designated work location to be dismissed, as was the normal practice of employees returning from jobs. (Cunningham Dep. 235). However, Cunningham asked co-worker Hansel to tell Supervisor Sahai that he was leaving without waiting to be dismissed because he did not want to be late for his class at Nassau Community College. (Cunningham Dep. 198). Supervisor Andre Sahai docked plaintiff's pay because he left a half hour early. (Id.). Cunningham felt he was entitled to a half hour of overtime for working during lunch. Cunningham believes he was docked in retaliation for his complaints of discrimination to Tabone. (Id.).

<u>Transmission Operations - October 2001 to February 22, 2002</u>[3]

In October 2001, Cunningham was transferred to Transmission Operations. Defendant asserts that Cunningham irritated his co-workers and supervisors in Transmission Operations by repeated reference to the fact that he had graduated from college and by implying that he knew more than they did about the work, despite being new at Con Edison. (Lew Dep. 73-74).

*Age Based Comments*

---

[3] Plaintiff was re-assigned to the Van Nest facility from July 2001 to October 6, 2001. However, nothing of relevance happened during that time.

During Cunningham's four months in Transmission Operations three comments were made to him that referred to his age or education. Cunningham claims that a supervisor he identified as "Joe Girard" told him that, "you're an older worker, and . . . because you have an education, you're not going to be well liked here." (Cunningham Dep. 295-96). Supervisor Abbitelli told Cunningham, "you got to move your ass, old man, you're working too slow." (Id. at 122.) Supervisor Freddie Haymack belittled Cunningham by saying, "you're the new-timer that's the old-timer that knows more than the old times." (Cunningham Dep. 124). Cunningham did not report any of these comments to the Con Ed's EEO. (Carey Aff. Ex. DD, Dobrini Dec. ¶10).

*Report on Cunningham's Complaints*

On January 16, 2002, Con Ed's Auditing Department[4] issued two reports on "Allegations of Ignored Safety Procedures," which included a discussion of the various allegations Cunningham had made to Bagwell and Tabone. (Carey Aff. Ex. BB ¶9; Carey Aff. Ex. L). The reports characterized all of Cunningham's claims, except the one pertaining to Gonzalez's alleged false accusations of sexual harassment, as claims relating to safety and environmental issues. (Id.).

*Altercation with Co-Worker Otero*

---

[4] The Auditing Department is responsible, among other things, for investigating employee complaints referred to it by the Office of the Corporate Ombudsman. [Tabone Dec. ¶2).

On January 29, 2002, Cunningham was involved in an
altercation with Otero, a co-worker, after Cunningham objected to
Otero's smoking in the company van. (Carey Aff. Ex. P.).
Cunningham claims that Otero initiated the altercation and made
the first threat.  Cunningham further states that Otero said,
"you're a real motherfucker in this department, you think you're
a tough guy, you don't like me smoking" and "fuck you and your
dog, I'll kill your dog and I'll come to your house and I'll fuck
you up." (Cunningham Dep. 251). Cunningham states that in
response he threatened to "fuck up" Mr. Otero and to shoot Mr.
Otero if Mr. Otero killed his dog. (Cunningham Dep. 258-260).

*Cunningham's Suspension, Arbitration, and Complaints*

As a result of the altercation, both employees were
suspended; Otero for 10 days, Cunningham for 17.5 days. This
discrepancy was explained by Manager Delabastide as a result of
Cunningham's "prior discipline."  On his return to work, after
his suspension, Cunningham received an "all inclusive warning."

Cunningham filed a grievance concerning his suspension and
receipt of an all-inclusive warning. His union sought arbitration
and, on October 17, 2002, an arbitration hearing was held.
Relying on the fact that Otero did not take Cunningham's threats
seriously, and that there was no record of formal prior
discipline against Cunningham, Arbitrator Mackenzie upheld the

suspension, but removed the "all inclusive warning." (Opinion and Award of Arbitrator Mackenzie, pg. CUN00000164).

On January 29, 2002, Cunningham sent Tabone an e-mail in which he complained that he had been suspended in retaliation for raising safety and environmental complaints and questioning why he had never heard from the EEO department. (Carey Aff. Ex. BB ¶7, Carey Aff. Ex. N). On February 5, 2002, Cunningham sent Deputy Ombudsman Richard Bagwell an e-mail about his suspension, identifying the reason for the suspension as related to his having complained about a safety issue. (Carey Aff. Ex. O). In this e-mail Cunningham also asserted that he had made charges of age discrimination, stating, "it is also ridiculous to have management spend almost a year to investigate charges of age discrimination and harassment." (Id). Bagwell wrote back and told Cunningham that neither Bagwell nor Tabone had heard from Cunningham that he had any age discrimination concerns, but rather had heard only about safety concerns and harassment. (Carey Aff. Ex. BB ¶7). Bagwell stated that if Cunningham had mentioned age discrimination issues "we would have forwarded that information to Corporate EEO." (Id.)

As a result of Tabone's failure to refer his complaints to the EEO, Cunningham then filed a charge of discrimination with the EEOC, which was accepted for investigation by the EEOC on February 26, 2002. (Plaintiff's Affidavit ¶13; Douglas

Affidavit). Cunningham states that even after filing his complaint he continued to inform Bagwell of further instances of discrimination and retaliation.

*Cunningham Returns to Work*

When Cunningham returned to work on February 22, 2002, after his suspension, he was assigned to the ASM PURRS plant, a special department within the substation department which maintains the cooling temperatures of high voltage feeders. Cunningham's supervisors were Dave Mocera and Ralph Gangi. (Cunningham Dep. 244).

Cunningham's first paycheck after his reinstatement was in the amount of $1.50. (Cunningham Aff. 20; Pl. Ex. E). Cunningham complained about the paycheck to Bagwell and told Bagwell that he believed the paycheck to be continued harassment. Cunningham further alleges that defendant suspended his e-mail account in order to restrict his access to Bagwell. (Cunningham Aff. 21).

*Cunningham Requests a New Assignment*

Shortly after returning to work Cunningham requested a transfer to a new work assignment, (Bagwell Dep. 67) either in Substation Operations or as a cable splicer in System and Transmission Operations (Pl. Ex. G, H). Cunningham did not receive a response to his request. (Bagwell Dep. 105). When he inquired about his requested transfer, Bagwell responded that the company kept giving him different dates. (Bagwell Dep. 107).

Cunningham was ultimately denied both positions. (Bagwell Dep. 75).

*Cunningham Fails Precision Instruments Test*

In April 2002, Cunningham took a Precision Instruments Practical Test, a prerequisite for a title change to "A" mechanic, but failed. (Pl. Ex. I). Cunningham complained to Bagwell that the Learning Center deliberately failed him and his co-worker Ariel Antomarchi because of O'Donnell's animosity towards them, due to their discrimination and retaliation complaints (Bagwell Dep. 89; Pl. Ex. F, H, I). Cunningham believes, that out of 142 individuals who took the exam, he and Antonmarchi were the only two who failed. In contrast, Con Ed provides records indicating that four other employees failed the test. [Def. Reply Ex. B]

*Cunningham Sends E-Mails resulting in his Termination*

On March 6, 2002, Cunningham sent an e-mail to Henry Watson, a fellow employee, requesting that he, or Supervisor Silva, explain in writing what they knew about Cunningham's having been denied a transfer to a cable splicer job and suggesting that the transfer had been denied because Watson said that he didn't think Cunningham would be a good splicer because he was "too overly concerned for safety," and that Watson had also said, "we bend the rules around here." (Carey Aff. Ex. R.). Watson responded denying he had made such statements. (Carey Aff. Ex. R).

Cunningham then replied alleging that one of them must be lying and suggesting that Watson, "refrain from making foolish statements." (Id.). Silva also responded to Cunningham's e-mail explaining that he did not have the power to decide when an application was accepted or rejected and that that decision was made by human resources. Cunningham responded accusing Silva of lying and said, "I'll wait for your fabrication." (Id.).

In June 2002, Cunningham received an e-mail, forwarded by supervisor Dave Mocera, from senior office assistant, Dennis Kieran, notifying him of a scheduled training. Cunningham responded indicating that he believed his training was scheduled for a different day and saying, "maybe you guys have to check that to make sure the left hand knows what the right hand is doing." (Carey Aff. Ex S). Kieran wrote back indicating that Cunningham was correct about the day of training and, evidently in response to plaintiff's accusatory tone, stated, "I guess your pencils do not have any erasers on them. You have a nice day." Cunningham then responded, "its great to see someone from MCS admit to their shortcomings! Keep up the good work lackey!" (Id.). Kieran responded, "I resent your remark, you seem to have a problem, maybe you should seek some help?" (Id.) Cunningham replied, "maybe you need to retire." (Id.) Kieran forwarded this e-mail to General Manager O'Donnell and Thomas Delabastide.

After a consultation with the Human Resources Department, Cunningham was fired. (Carey Aff. P.) At his disciplinary interview Cunningham was told that he had engaged in "inappropriate and discourteous conduct directed at both supervisors and fellow co-workers . . .in violation of the Company's values of concern, courtesy and teamwork" (Id.) Cunningham maintains that he was fired in retaliation for his complaints to Bagwell.

*Arbitration and Reinstatement*

Cunningham's union sought arbitration of his discharge. An arbitration hearing was held on January 7, 2003. Arbitrator Riegel determined that the company had reasonable and sufficient cause to discipline Cunningham for his discourteous e-mail messages, but that because the All Inclusive final Warning had been rescinded in an earlier arbitration, and plaintiff's remarks that led to his termination were, unlike his previous remarks analyzed in the earlier arbitration, unrelated to the Con Edison Violence in the Workplace Policy, termination was inappropriate and should be converted to a three day suspension.  Cunningham was awarded back pay for the period since his termination, less three days pay for suspension, and given a final warning. (Id.). Cunningham was reinstated on or about March 3, 2003. He then reiterated his request to Bagwell for a transfer to the Substations Department. (Pl. Ex. L.). In March 2003 Bagwell

informed Cunningham that he would not be transferred. (Cunningham Aff. 27). Plaintiff alleges that defendant also retaliated against him by failing to process his back pay for three months. (Cunningham Aff. 26). Cunningham complained to Bagwell about the alleged retaliation. (Bagwell Dep. 125, Pl. Ex. L).

*EEOC Issues Notice of Right to Sue; Complaint Filed*

On April 23, 2003 the EEOC issued Cunningham a Notice of Right to Sue. According to Cunningham this was in reference to charge no 160-A2-00779 [the 2002 charge]. (Pl. Ex. Q).  In contrast, defendant claims the Notice of Right to Sue was in reference to charge no. 160-2002-00779 [the 2003 charge]. (Dobrini Dec. ¶14).

On July 18, 2003, plaintiff filed his complaint in this action. On September 26, 2003, defendant timely filed its answer to the complaint.

*Final Work Assignment*

After his reinstatement Cunningham was assigned to a Maintenance Services Facility at the 27th and Third Avenue trailer yard in Brooklyn. (Cunningham Dep. 245). On November 20, 2003, Cunningham was reinstalling a stop sign with co-workers. Believing that they were unqualified to do the work, Cunningham "called a time out" (stopped work for a safety reason, pursuant to a program authorized by the company to assure that workers need not continue to work where they believe hazardous conditions

exist, unless and until a safety professional has determined that no hazard exists). (Carey Aff Exhibit U, V). While waiting for safety personnel, Cunningham received permission from Supervisor Renny Linton to get lunch. While Cunningham was eating lunch in his truck Supervisor Marovic approached and told him that Gregory Rucco, an environment, health and safety representative, was on the telephone. Cunningham told Marovic that he was eating lunch. A few minutes later Marovic returned to the truck. According to Cunningham, Marovic opened the door to the truck and forced the telephone on to him in response to which Cunningham asked Marovic to stop harassing him and allow him to finish his lunch.(Pl. Ex. M). Defendant asserts that when Marovic approached his truck a second time to inquire if Cunningham was ready to speak to Rucco, Cunningham responded, "I am still on fucking lunch, don't fucking harass me, I'm not fucking talking to you, I cleared my lunch with my supervisor." (Id.) Cunningham claims that Marovic falsely accused him of directing profanity towards him as retaliation for Cunningham's complaint to the Ombudsman's office. (Cunningham Aff. ¶29).

On November 21, 2003, Cunningham refused to attend a meeting when instructed to do so by supervisor Linton. (Def. R. 56.1 ¶19). Cunningham does not dispute that he refused to do so, but explains that he refused because he was experiencing extreme emotional distress due to his supervisors' continued harassment.

Plaintiff says he felt "ill and threatened" and requested permission to go home (Pl. Ex. M).  On December 29, 2003, Cunningham refused to speak with Con Edison Human Resources Representative David Burke (Carey Aff. Ex. U). Cunningham states that this was because defendant refused to permit him to be represented by his attorney at this meeting.

On January 12, 2004, plaintiff submitted a resignation letter to Con Edison. Plaintiff maintains that his resignation was involuntary and was a constructive discharge caused by defendant's retaliatory conduct. (Cunningham Aff. ¶30).

On February 25, 2004, plaintiff filed an amended complaint. On March 30, 2004, defendant filed its answer to the amended complaint. On May 14, 2004, defendant served plaintiff with a set or interrogatories and documents requests, including a requested copy of "each charge of discrimination filed by plaintiff with the U.S. Equal Employment Opportunity Commission ("EEOC")." On June 1, 2004, plaintiff served his response to interrogatory including a copy of the 2002 charge of discrimination under docket number 160-A2-00079.

Ariel Antonmarchi:

Cunningham submits an affidavit from his co-worker, Ariel Antonmarchi, as evidence that Con Ed retaliated against employees who complained of discrimination, and specifically that Con Ed

retaliated against Cunningham. Antonmarchi is a forty year old Puerto Rican male (Antonmarchi Aff. ¶1). He began working for Con Ed in July of 2000. He states that throughout the course of his employment he experienced discriminatory treatment on the basis of his race and national origin and that in October of 2000 he complained to Tabone that he was suffering race and national origin discrimination. (Id. at ¶5). Antonmarchi states that he continued to complain of discrimination to both Bagwell and Tabone. (Id. at ¶12).

In 2001 Antonmarchi met Cunningham when they worked together at the Van Nest location. (Id. at ¶6).

In July 2001, Antonmarchi states that a co-worker at the Van Nest location, Rosa Rodriguez, warned him to be careful because Con Ed was determined to get rid of him and Cunningham because they had complained of discrimination. (Id. at ¶10).

In August 2001 Antonmarchi reports that he was summoned to a meeting with Boland and Debastide, informed that he [Antonmarchi] and Cunningham were causing trouble by complaining about discrimination and warned that they would be removed from the department and given the least desirable assignments. (Id. at ¶11).

On October 18, 2002, Antonmarchi attended Cunningham's arbitration because he wished to testify on Cunningham's behalf. However, Antonmarchi asserts that he was not permitted to do so

by defendant's representatives, including Delabastide.
(Atonmarchi Aff. ¶17).

On July 27, 2002, one day prior to Cunningham's termination,
Antonmarchi states that Bagwell called him to advise him that his
investigation was complete he would receive a promotion (Id. at
¶18). However, Antonmarchi claims that when he met Bagwell the
next day to sign some papers in connection with his promotion,
Bagwell informed him that he was signing papers stating that
Cunningham was disgruntled. (Id. at ¶19). When Antonmarchi
refused to sign the papers, he claimed that Bagwell told him that
his investigation was not complete. Three days later Antonmarchi
claims Bagwell informed him he would not get a promotion. (Id. at
¶20).

On August 28, 2002, O'Donnell and Boland told Antonmarchi he
was being terminated. Antonmarchi claims they told him this was
due to his refusal to assist in the investigation of a co-worker.
(Id. at ¶21).

## DISCUSSION

### Summary Judgment Standard

A court must grant a motion for summary judgment if the
movant shows that "there is no genuine issue as to any material
fact" and that "the moving party is entitled to a judgment as a
matter of law." Fed. R. Civ. P. 56©). Summary judgment is
appropriate "[w]hen the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party."
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.
574, 587 (1986). "The trial court's function in deciding such a
motion is not to weigh the evidence or resolve issues of fact,
but to decide instead whether, after resolving all ambiguities
and drawing all inferences in favor of the non-moving party, a
rational juror could find in favor of that party." *Pinto v.
Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). Although
all facts and inferences therefrom are to be construed in the
light most favorable to the party opposing the motion, *see Harlen
Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001),
the nonmoving party must raise more than just "metaphysical doubt
as to the material facts," *Matsushita*, 475 U.S. at 586.

In the employment discrimination context, where a case often
turns on the intent of the employer a "trial court must be
cautious about granting summary judgment." *Gallo v. Prudential*,
22 F.3d 1219, 1224 (2d Cir. 1994); *Chambers v. TRM*, 43 F.3d 29,
40 (2d Cir. 1994); *Morris v. Amalgamated Lithographers*, 994
F.Supp. 161, 168 (S.D.N.Y. 1998); *Hernandez v. New York City Law
Dep't*, 1997 WL 27047 at *7 (S.D.N.Y. 1997). "Because the employer
rarely leaves direct evidence of its discriminatory intent, the
Court must carefully comb the available evidence in search of
circumstantial proof to undercut the defendant's explanations for
its actions." *Douglas v. Victor Capital Group*, 21 F. Supp. 2d

379, 387 (S.D.N.Y. 1998); *Gallo*, 22 F.3d at 1224; *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990); *Morris*, 994 F.Supp. at 168; *Hernandez*, 1997 WL 27047 at *7. However, mere conclusory allegations of discrimination by plaintiff will not prevail when defendant has provided convincing evidence to explain its conduct. *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir.1997); *Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir.1995); *Burger v. Litton*, 1996 WL 421449, *7 (S.D.N.Y. 1996); *Engelmann v. National Broad. Co.*, 94 Civ. 5616, 1996 WL 76107 at *7 (S.D.N.Y. Feb.22, 1996). In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Stern*, 131 F.3d at 312.


Claims Abandoned by the Plaintiff

Plaintiff's complaint sets forth nine claims for relief. Claims 1-6 concern plaintiff's hostile work environment claims. Claims 7-9 concern his retaliation claims. Defendant's motion for summary judgment requests dismissal of all claims, but plaintiff's response addresses only claims 7-9. Further, plaintiff concedes that summary judgment is appropriate with respect to claims 1-6 when he states, "Plaintiff opposes

Defendant's motion inasmuch as it seeks to dismiss the Seventh,
Eight and Ninth Claims for Relief in the Complaint." (Pl. Mem.
Law, pg. 2, note 2). "Where [a] claim was alleged in the
complaint but 'not raised elsewhere in the record,' a court deems
the claim 'abandoned' and grants defendants' summary judgment
motion." *Douglas*, 21 F.Supp. 2d at 393(quoting *Singleton v. City
of Newburgh*, 1 F.Supp 2d 306, 312 (S.D.N.Y 1998); *Anti-Monopoly,
Inc., v. Hasbro, Inc.*, 958 F.Supp. 895, 907 & n. 11 (S.D.N.Y.
1997) ("the failure to provide argument on a point at issue
constitutes abandonment of the issue"), aff'd, 130 F.3d 1101 (2d
Cir. 1997); *National Communications Ass'n, Inc. v. American Tel.
& Tel. Co.*, 1998 WL 118174, *28 (S.D.N.Y. 1998).

<u>Are Plaintiff's Federal Claims Time Barred?</u>[5]

A district court has jurisdiction over private Title VII
claims only when the plaintiff first files a charge with the
EEOC. 42 U.S.C. §2000e-5; *Findlay v. Reynolds Metals Co., Inc.*,
82 F.Supp. 2d 27, 32 (N.D.N.Y. 2000); *Butts v. City of New York
Dep't of Hous. Preservation & Dev.*, 990 F.2d 1397, 1401 (2d Cir.
1993) ("When a plaintiff fails to file a timely charge with the
EEOC [in a Title VII case], the claim is time barred.... A
district court only has jurisdiction to hear Title VII claims

---

[5] Plaintiff's state law claims under NYHRL and NYCHRL are governed by a
three year statute of limitations. N.Y. Civ Prac. L. & R. 214(2); *Van Zant v.
KLM Royal Dutch Airlines*, 80 F. 3d 708 (2d Cir. 1996), *Koerner v. State*, 62
N.Y.2d 442 (1984). Recovery is therefore precluded under these statutes only
for events that occurred before July 18, 2000.

that . . . are included in an EEOC charge"). This statutory requirement is analogous to a statute of limitations. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394,(1982).

A charge must be accepted by the EEOC within "one hundred and eighty days after the alleged unlawful employment practice occurred" or "in a case of an unlawful employment practice with respect to within the person aggrieved has initially instituted proceedings with a State or local agency . . . within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. §2000e-5(e)(1). As the parties agree that the three hundred day limit applies, it may be accepted as a stipulated fact. *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996).

The parties agree that the plaintiff filed an EEOC charge on February 10, 2003. Three hundred days prior to that date is April 15, 2002. However, plaintiff asserts that he filed an earlier charge of discrimination with the EEOC, pro se, in February 2002 and that the EEOC accepted the charge for investigation on February 26, 2002. Three hundred days prior to February 26, 2001 is May 1, 2001.

As evidence of a February 2002 charge, plaintiff submits (1) a letter dated February 12, 2002 from the EEOC, responding to plaintiff's request, and providing information on how to file a EEOC charge; (2) a certified mail receipt indicating that

plaintiff mailed a letter to the EEOC on February 19, 2002; (3) a letter from plaintiff to the EEOC dated February 19, 2002 outlining plaintiff's grievances against his employer including allegations of age and race based discrimination and retaliation; and (4) the affidavit of John Douglass, supervisor of the charge receipt/technical information Unit for the EEOC's New York District Office stating that charge No. 160-2002-00779 was accepted for investigation on February 26, 2002, that on April 24, 2003 a notice of right to sue was issued on that charge, and that on July 23, 2004 the case file concerning that charge was destroyed.

However, defendant complains that plaintiff's response to an interrogatory requesting a copy of "each charge of discrimination filed by plaintiff with the U.S. Equal Employment Opportunity Commission ("EEOC")" included only the February 10, 2003 charge. At plaintiff's deposition, both he and his attorney confirmed that the February 10, 2003 charge was the charge produced during discovery, without making any mention of an earlier charge. Defendant states, and plaintiff does not dispute, that no reference to an earlier charge was made until a subsequent conference before this Court. Further, plaintiff does not appear to have produced evidence of this charge until it submitted the evidence in connection with this motion.

Defendant argues that plaintiff's failure to properly disclose the February 26, 2002 charge and the affidavit of John Douglass confirming the charge, should now preclude its use. Under Federal Rule of Civil Procedure 26(e)(2):

> a party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Further, under Federal Rule of Civil Procedure 37(c)(1).

> a party that without substantial justification fails to disclose information required . . . by Rule 26(e)(2) is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any . . . information not so disclosed.

Plaintiff should have amended his interrogatory response and given the defendant evidence of the earlier charge. However, "the imposition of sanctions under this rule is discretionary, and preclusion is ordered only rarely." *Potter v. Phillips*, 2004 WL 3250122, *2 (E.D.N.Y. 2004)(internal citations omitted); *Semi-Tech Litigation LLC v. Bankers Trust Co.*, 219 F.R.D. 324, 325 (S.D.N.Y. 2004). There has been no suggestion that plaintiff's failure to produce the earlier charge was anything but a mistake. As there does not appear to have been any bad faith, this is not one of the rare cases where preclusion is appropriate. *Potter* 2004 WL 3250122 *1 (granting preclusion where defense counsel intentionally lied about having retained an expert and did not

correct the lie for more than nine months). Furthermore,
defendant has not been harmed by this oversight as is required
for preclusion under Rule 37, because defendant investigated,
considered, and addressed the issue of retaliation occurring
before April 15, 2002, despite arguing that it was precluded.
Plaintiff's claims concerning events which occurred prior to
February 26, 2002 are thus timely.

Defendant further argues that plaintiff's claims arising
after the acceptance of his EEOC charge are barred because
plaintiff has not exhausted his administrative procedures and
remedies in regard to those claims. However, where subsequent
claims are "reasonably related" to claims brought in an EEOC
charge, the subsequent claims are not barred. A claim is
"reasonably related" in three situations:

> 1) where "the conduct complained of would fall within
> the 'scope of the EEOC investigation which can
> reasonably be expected to grow out of the charge of
> discrimination;'" 2) where the complaint is "one
> alleging retaliation by an employer against an employee
> for filing an EEOC charge;" and 3) where the complaint
> "alleges further incidents of discrimination carried
> out in precisely the same manner alleged in the EEOC
> charge." *Terry v. Ashcroft*, 336 F.3d 128,151 (2d Cir.
> 2003)(quoting, *Butts v. City of New York Dep't of Hous.*
> *Pres. & Dev.*, 990 F.2d 1397, 1402-03 (2d Cir. 1993)
> (superceded on other grounds).

In this case, plaintiff alleges that events occurring after the
EEOC charge, namely defendant's failure to process his back pay
for three months, Marovic's fabricated allegations of

Cunningham's profanity, and Cunningham's second suspension, were all retaliation by Con Edison against him for filing an EEOC charge and for complaining to the Ombudsman. These complaints thus fit squarely into the second "reasonably related" category and can be asserted against the defendant despite the fact that no separate EEOC charge was filed as to these claims.

## Precluded Testimony

Defendant argues that the affidavit of Ariel Antonmarchi submitted by plaintiff must be excluded under Rule 37(c)(1). As discussed above, Rule 37(c)(1) states that:

> a party that without substantial justification fails to disclose information required . . . by Rule 26(a) or 26(e)(2) is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any . . . information not so disclosed.

On February 23, 2004, the plaintiff served the defendant with plaintiff's Rule 26(a) Automatic Disclosures, which identified fifteen persons with pertinent information to the case. The list did not contain Ariel Antonmarchi's name and was never amended to include Antonmarchi's name. It was not until the last day of plaintiff's deposition, ten months later, that plaintiff's counsel first mentioned that Antonmarchi might be used as a witness in the present action. Moreover, plaintiff never formally amended his disclosures to include Antonmarchi's name. Because plaintiff's deposition occurred at the very end of

the discovery period, defendant did not have the opportunity to depose Antonmarchi or to prepare questions for Cunningham concerning Antonmarchi. " Although preclusion is ordered only rarely" under this rule, *Potter v. Phillips*, 2004 WL 3250122, *2 (E.D.N.Y. 2004), such preclusion is at the discretion of the trial court.

The disclosing party is excused if it offers a "substantial justification for its failure to disclose." Rule 37©). The rule "places the burden on the non-disclosing party to demonstrate substantial justification." *Potter v. Phillips,* 2004 WL 3250122, *2(E.D.N.Y. 2004). However, plaintiff has offered no explanation of his delay in providing Antonmarchi's name to the defendant. Plaintiff was clearly aware that Antonmarchi had relevant information, as the two worked together and Antonmarchi attended Cunningham's arbitration.

It is also the non-disclosing party's burden to show that its failure to disclose was harmless. *Potter v. Phillips,* 2004 WL 3250122 at *2. Plaintiff's failure to disclose Antonmarchi's name will harm the defendant if his affidavit is admitted. Antonmarchi's affidavit is the sole direct evidence suggesting that Con Ed was retaliating against Cunningham. However, the affidavit is vague, conclusory, and in parts, implausible.[6] The

---

[6] It is not the role of a trial court to consider credibility on a motion for summary judgment. However, Antonmarchi's lack of credibility is relevant here because it suggests that had defendant been allowed the opportunity to question him defendant might well have succeeded in exposing

affidavit references "discrimination" without specifying whether
such discrimination was race or age based discrimination or was
discrimination based on plaintiff's having made safety
complaints.[7] The affidavit references comments by other employees
without specifying when, in what context, or by whom such
comments were made. Furthermore, the affidavit discusses
statements by third parties which constitute hearsay.[8]

If defendant had been permitted to depose Antomarchi and/or
to question Cunningham about his relationship to Antonmarchi,
defendant might have been able to show that Antonmarchi was
actually talking about retaliation on the basis of safety
concerns, to elicit information about why Antonmarchi had been
fired which would show a motive to retaliate against Con Ed, or
to question the veracity of his statement that Deputy Ombudsmen
Bagwell, whose job it is to hear internal complaints, offered
Antonmarchi a promotion in return for his testimony against
Cunningham, and then fired Antonmarchi when he refused.

Rule 26 "is intended to allow "opposing parties to have a
reasonable opportunity [to] prepare for effective cross

---

Antonmarchi's statements as irrelevant or untrue.

[7] Retaliation against an employee for making safety complaints is not
actionable under Title VII or the parallel state statutes. See section below
defining a "protected activity."

[8] Only admissible evidence may be considered on summary judgment.
*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d
Cir.); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d. 256, 271 (2d Cir.
1002). Hearsay is inadmissible evidence. Thus, even if parts of Antonmarchi's
affidavit are admitted, the hearsay statements cannot be admitted.

examination," and to question other witnesses in order to rebut a witness's testimony. *Lamarca v. U.S.*, 31 F.Supp. 2d 110, 122 (E.D.N.Y. 1998)(quoting *Complaint of Kreta Shipping, S.A.*, 181 F.R.D. 273, 275 (S.D.N.Y. 1998). Where a party is denied the opportunity for such preparation, the testimony must be excluded. Moreover, it is of no significance that had defendant deposed Antonmarchi or asked Cunningham about Antonmarchi, defendant might not have shown Antonmarchi's statements to be untrue or irrelevant. A party's failure to disclose is harmful even where it prevents the other side from attempting to acquire evidence which *might* contradict the undisclosed testimony. *Giladi v. Strauch*, 2001 WL 388052. (holding that plaintiff's failure to disclose expert witness's prior testimony was not harmless because it precluded defendant from attempting to acquire the prior testimony, which might contradict expert's current testimony). Thus, where as here, defendant has been denied the opportunity to cross-examine a witness or to prove his testimony inaccurate through alternative witnesses, the defendant is harmed and the affidavit must be excluded.[9]

---

[9] By letter dated December 13, 2005 the plaintiff, against the advice of his lawyer, wrote to the Court requesting that he be allowed to add an omitted statement from the affidavit of Ariel Antonmarchi and to submit new evidence. For those reasons explained further above, no new evidence may be submitted at this stage. Because the affidavit of Antonmarchi is not admissible at all, no additional statement added to it is admissible either.

The Retaliation Claim[10]

In order to establish a *prima facie* case of retaliation a plaintiff must show that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; (3) the defendant was aware of the activity; and (4) there was a casual connection between the protected activity and the adverse employment action. *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998); *Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426 (2d Cir. 1999); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir.1996).

Protected Activity:

A protected activity is an "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.* 202 F.3d 560, 566 (2d Cir. 2000). Such opposition may be voiced as an informal or formal complaint. *Lamberson v. Six West Retail Acquisition, Inc.*, 122 F.Supp.2d 502, 511 (S.D.N.Y 2000); *Iannone v. Frederic R. Harris, Inc.*, 941 F.Supp. 403, 410 (S.D.N.Y. 1996). Protected activities include "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in

---

[10]Courts apply the same standard used in Title VII cases in analyzing NYHRL and NYCHRL retaliation claims. *Whidbee v. Garzarelli Food Specialities*, 223 F.3d 62, 69 (2d Cir. 2000); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565, n.1 (2d Cir. 2000); *Gordon v. New York City Bd. of Education.*, 232 F.3d 111 (2d Cir. 2000);

general, and expressing support of co-workers who have filed formal charges." *Cruz v. Coach Stores*, Inc., 202 F.3d 560, 566 (2d Cir. 2000) (quoting *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990)). However, in order to constitute a "protected activity" the opposition must be directed against something that is an "unlawful employment practice." *Manoharan v. Columbia University College of Physicians and Surgeons*, 842 F.2d 590, 594 (2d Cir. 1988). Because Title VII prohibits retaliation based only on complaints of "race, color, religion, sex or national origin" discrimination, 42 U.S.C. §2000e-2(a)(1), plaintiff's allegations that he was retaliated against because of his safety or environmental health complaints are not relevant here.

Construing the facts in the light most favorable to the non-moving party, plaintiff complained to Supervisor Boland about Collucci's age based comments. Plaintiff also complained to Bagwell and Tabone about his supervisors' age based remarks. Plaintiff then told Bagwell he was going to file an EEOC charge. He did in fact file it, and defendant was notified of the charge. Finally, plaintiff filed the complaint in this case. Each of the above actions constitute a "protected activity."

Defendant was Aware of Plaintiff's Protected Activity

Plaintiff does not have to show that the individual supervisors who subjected him to adverse employment action knew of his age and race discrimination complaints.[11] Rather, it is enough to show that Con Edison had a "general corporate knowledge." *Gordon v. New York City Board of Education*, 232 F.3d 111, 116 (2d Cir. 2000) (holding that where the Board of Education knew of a teacher's protected activity it did not matter that there was a lack of evidence that the individual Board agents who took the adverse employment action knew of the protected activity); *Alston v. New York City Transit Auth.*, 14 F.Supp.2d 308, 311 (S.D.N.Y. 1998) ("In order to satisfy the second prong of her retaliation claim, plaintiff need not show that individual decision-makers within the NYCTA knew that she had filed . . . [an] EEOC complaint."); *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2d Cir. 1996).

After Cunningham filed the EEOC charge and Con Edison received notice, and certainly after Cunningham filed the complaint in this case, Con Edison can be said to have "general corporate knowledge" and any adverse employment actions thereafter can be seen as retaliation. Further, although defendant asserts that the Ombudsman and Auditing personnel did not believe that Cunningham's complaints concerned age, a jury

_____

[11] "Lack of knowledge on the part of particular individual agents is admissible as some evidence of lack of causal connection, countering [a] plaintiff's circumstantial evidence of proximity or disparate treatment" Gordon, 232 F.3d at 117.

might decide that Cunningham did complain to the Ombudsman and Auditing about age discrimination and that the Con Edison management's denials were untrue. As the facts here must be construed for the plaintiff, and a rational jury could decide to credit the plaintiff's allegations, plaintiff has met his burden on this prong.

Adverse Employment Action

An adverse employment action is a "material adverse change in the terms and conditions of employment." *Torres v. Pisano* 116 F.3d 625 (2d Cir. 1997) (quoting *McKenney v. New York City Off-Track Betting Corp.*, 903 F.Supp. 619, 623 (S.D.N.Y. 1995)). To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities, but "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished internal responsibilities, or other indices . . . unique to a particular situation." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "In the usual case, the alleged retaliatory action [will have clearly] affected the terms, privileges, duration or conditions of the plaintiff's employment" *Ronney v. Witco Corp.*, 722 F.Supp. 1040, 1046 (S.D.N.Y 1989).

In this case plaintiff alleges the following adverse employment actions: (1) plaintiff's June 2002 termination;[12] (2) plaintiff's unpaid suspension in January 2002; (3) plaintiff's unpaid suspension in November 2003; (4) defendant's delay in processing plaintiff's back pay; (5) defendant's delay of plaintiff's tuition reimbursement; (6) defendant's docking plaintiff one half-hour; (7) Supervisor Marovic's false allegations of profanity against Cunningham; (8) defendant's denial of plaintiff's application to transfer to Substations Systems and Transmission Operations; (9) defendant's failure of plaintiff on the precision instruments practical test, (10) defendant's suspension of plaintiff's e-mail address; and (11) constructive discharge.

Termination is clearly an adverse employment action. *Quinn v. Green Tree Credit Corporation*, 159 F.3d 759, 769 (2d Cir. 1998); *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004); *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2005).

Suspension without pay is also an adverse employment action. *LoveJoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001). Thus, plaintiff's two suspensions are adverse

---

[12] Defendant does not challenge the fact that the termination and suspensions qualify as adverse employment actions.

employment actions. This is true even where the employee is
eventually reimbursed for his lost wages, because the employee
suffers the "loss of use" of his wages until they are reimbursed.
*Id*. at 223. Even unaccompanied by a suspension, "the lost use of
wages for a period of time is, by itself, an economic injury that
can qualify as a tangible employment action." *Jin v. Metropolitan
Life Ins. Co.*, 310 F.3d 84, 100 (2d Cir. 2002). Thus, Con
Edison's deliberate failure to process Cunningham's back pay for
three months is also an adverse employment action because
plaintiff lost the use of his wages for those months. Since
tuition reimbursement, like wages, is money owed to the employee
by the employer, a deliberate delay in tuition reimbursement is
also an adverse employment action. *Morris v. Lindau*, 196 F.3d
102, 110 (2d Cir.1999)("failure to process teacher's insurance
forms" was an adverse employment action). Finally, docking of an
employee's pay is an adverse employment action. *Mills v. George
R. Funaro & Co.*, 2001 WL 50893 (S.D.N.Y. 2001).

An employer's failure to promote an employee, or the
demotion of an employee is an adverse employment action. *Mormol
v. Costco Wholesale Corp.*, 364 F.3d 54, 57 (2d Cir. 2004),
*Burlington Indus., Inc. v. Ellerth*, 524 U.S. at 761, 118 S.Ct.
2257). Defendant's deliberately failing plaintiff on an exam
which would have granted him a promotion is thus an adverse

employment action.[13] Similarly, Supervisor Marovic's false allegations against Cunningham may be considered an adverse employment action in its own right since it caused the adverse employment action of his suspension. Alternatively, since "express accusations of lying" have been held to be an adverse employment action, express accusations of profanity should be an adverse employment action as well. *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).

Defendant's failure to transfer plaintiff to Substations and System and Transmission Operations is not an adverse employment action. Plaintiff's request for the new position appears to stem not from the job attributes of the new position, but rather, from a desire for a fresh start. The denial of a request for a lateral transfer is not an adverse employment action. *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123 (2d Cir. 2004). This is true even where employee has a personal preference for the transfer, as here, where the plaintiff wished for a "new start." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532-33 n. 6 (10th Cir. 1998).

Defendant's suspension of plaintiff's e-mail address also does not rise to the level of an adverse employment action. An

---

[13] Plaintiff does not have strong evidence that he was deliberately failed. However, construing the evidence in his favor and taking heed of the *Gallo* court's warning that district courts must be careful in granting summary judgment where, as here, the issue is one of intent, this Court finds that a reasonable jury could find that where 6 of 142 employees failed an exam and 2/6 were those who had made complaints of discrimination, the failure of those 2 was retaliation for their complaints. 22 F.3d 1219.

adverse employment action must be more than a "mere inconvenience." *Galabya*, 202 F.3d at 640. Thus, for example, the loss of a phone, standing alone, is not an adverse employment action. *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462 (2d Cir. 1997). Since in the modern office environment e-mail serves essentially the same function as a phone, the loss of e-mail is also not an adverse employment action.

Finally, plaintiff alleges that his constructive discharge was an adverse employment action. "In order to establish a constructive discharge, an employment discrimination plaintiff must demonstrate that his employer acted deliberately to 'make [his] working conditions so intolerable that [he] is forced into an involuntary resignation.'" *Linden v. Sherman,* 2003 WL 22441998*, *1 (2d Cir. 2003)(quoting *Lopez v. S.B. Thomas*, 831 F.2d 1184, 1188 (2d Cir. 1987)). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pa. State Police v. Suders*, 542 U.S. 129, 137 (2004).

The relevant working conditions in this case include the following: plaintiff was twice suspended, terminated but reinstated, experienced delays in the processing of his back pay and tuition reimbursement, was intentionally failed on a precision instruments practical test and had his e-mail suspended. These working conditions do not rise to the level of

constructive discharge. *Spence v. Maryland Cas. Co.,* 995 F.2d
1147 (2d Cir. 1993) (holding that criticism for poor performance,
denial of salary increase, being placed on probation, rough
treatment by supervisor, and comments that supervisor wished
plaintiff to become ill not sufficient); *Katz v. Beth Israel
Medical Center*, 2001 WL 11064, *14 (S.D.N.Y.,2001)(An employee is
not constructively discharged because she does not like her
assignments, receives unfair criticism, or is yelled at by
supervisors); *Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360 (2d
Cir.1993) (evidence of employee's dissatisfaction with work
assignments, or disagreement with criticism of work quality,
insufficient to establish constructive discharge); *Muller v.
United States Steel Corp.*, 509 F.2d 923, 929 (10th Cir.), cert.
denied, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975)
(unfavorable job assignment and discriminatory failure to promote
does not constitute constructive discharge).


Causal Connection

The final element plaintiff must prove in a retaliation
claim is a causal connection between the protected activity and
the adverse employment action taken by the employer. Where, as
here, direct causal evidence to connect the protected activity
and the adverse employment action is not available, the causal
connection "can be established indirectly by showing that the

protected activity was closely followed in time by the adverse action." *Cifra v. G.E. Co.,* 252 F.3d 205, 216 (2d Cir. 2001)(quoting *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir. 1996); *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir. 1986). However, "the cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74,(2001). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554-555 & n. 5 (2d Cir. 2001) (collecting cases). Despite this, a passage of two months between the protected activity and the adverse employment action seems to be the dividing line. *Hussein v. Hotel Employees & Restaurant Union, Local 6*, 108 F.Supp.2d 360, 367 (S.D.N.Y. 2000)("the passage of more than two months defeats any retaliatory nexus"); *Ponticelli v. Zurich American Ins. Group*, 16 F.Supp.2d 414, 436 (S.D.N.Y.,1998) (two-and-a-half months is "hardly the close proximity of time contemplated . . .for allowing a plaintiff to establish the "causal connection" element

of retaliation claim"); *Ashok v. Barnhart*, 289 F.Supp.2d 305, 315 (E.D.N.Y 2003)("a period of only two months between a protected activity and an adverse action may permit a reasonable jury to find the acts to be temporally proximate and causally related"); *Lamberson v. Six West Retail Acquisition, Inc.*,122 F.Supp.2d 502, 512 (S.D.N.Y. 2000) (employee fired 2 months after making complaints was a sufficiently close temporal proximity to infer a causal connection); *Quinn*, 159 F.3d at 769 (discharge following less than two months after filing a complaint was sufficient evidence of a causal connection to preclude summary judgment).

Thus, plaintiff engaged in five protected activities and experienced eight adverse employment actions.[14] Three of these

---

14

| Date | Protected Activity | Adverse Action |
|------|--------------------|----------------|
| March 2000 | Cunningham complains to Boland about Collucci's remarks. | |
| May 2001 | Cunningham makes initial complaint to Bagwell and Tabone (Cunningham alleges that he continued to complain for several months and continued to inquire as to when Bagwell's inquiry into his complaints would finish). | |
| May 2001 | | Cunningham's tuition reimbursement is delayed |
| June 2001 | | Cunningham's pay is docked |
| January 2002 | | Cunningham is suspended for 17.5 days |
| February 2002 | Cunningham tells Bagwell he intends to file with the EEOC (and does so). | |

adverse employment actions follow sufficiently closely behind plaintiff's protected activity that an inference of causation is appropriate.

Beginning on May 9, 2001, Cunningham complained to Bagwell and Tabone that he was experiencing age discrimination. Later in May, and thus less than a month later, Cunningham's tuition reimbursement was delayed. Because of the close temporal proximity, an inference that the delay was a response to his complaints is appropriate. Cunningham claims that he continued to complain to Bagwell and Tabone over the next few months. Cunningham specifically states that on June 4, 2001 he raised harassment issues in a meeting with Tabone. Thus, the docking of his pay later in June also followed a protected activity by less than a month and again the inference that the delay was a response to his complaints is appropriate.

| | | |
|---|---|---|
| May 13, 2002 | | Cunningham takes employment exam, which he fails. |
| June 28, 2002 | | Cunningham is fired. |
| March 3, 2003 | | Defendant is reinstated, but his back pay is delayed three months. |
| July 18, 2003 | Cunningham files complaint in this case | |
| November 20, 2003 | | Marovic fraudulently claims that Cunningham cursed at him |
| November 21, 2003 | | Cunningham suspended |

In January 2002, Bagwell issued his report concerning
Cunningham's complaints. Cunningham claims that he continued to
complain to Bagwell and Tabone in the months after his initial
May 2001 complaint. Cunningham further states that he repeatedly
inquired about the status of Bagwell's report. A jury could thus
reasonably infer that Cunningham's protected activity of
complaining to Bagwell and Tabone continued until Bagwell's
report was issued on January 16, 2002. If so, then Cunningham's
January 29, 2002 suspension followed as close as thirteen days
after his protected activity, but in any case, certainly within
two months. Thus, an inference that the 2002 suspension was
caused by Cunningham's protected activity is appropriate.

In contrast, the most recent protected activity preceding
Cunningham's May 13, 2002 test failure, June 28, 2002 termination
and March 3, 2003 back pay delay is his statement to Bagwell in
February 2002 that he intended to file an EEOC complaint and the
filing of that complaint. This lag of three, four, and fourteen
months is too long for a causal inference to be appropriate.
Similarly, the closest protected activity preceding Marovic's
November 20, 2003 allegedly fraudulent allegations and
Cunningham's November 21, 2003 suspension is Cunningham's filing
of the complaint on July 18, 2003. This seven month lag is also
too long for a causal inference.

<u>Burden Shifting and Pretext</u>

Where the plaintiff has established a *prima facie* case of
retaliation, the burden shifts to the defendant to rebut that
presumption by articulating a legitimate, non-discriminatory
reason for its actions. *Richardson v. New York State Dept. of
Correctional Service*, 180 F.3d 426 (2d Cir. 1999); *Van Zant*, 80
F.3d at 713. "The defendant need not persuade the court that it
was actually motivated by the proffered reasons. (internal
citations omitted). It is sufficient if the defendant's evidence
raises a genuine issue of fact as to whether it discriminated
against the plaintiff." *Texas Dept. of Community Affairs v.
Burdine,* 450 U.S. 248, 254 (1981).

Defendant in this case presents the following legitimate,
non-discriminatory reason for its actions: that Cunningham's work
performance was unsatisfactory, that he left work early without
permission, that he had a hostile and abusive manner of
interacting with his co-workers and supervisors, that he
threatened and fought with co-worker Otero, that he directed
profanity to Supervisor Marovic, refused to speak with a
environment, health and safety representative, and despite an
order from supervisor Linton, refused to speak with Human
Resources Representative Burke.

Once defendant has met this burden, "the plaintiff must
point to evidence that would be sufficient to permit a rational

factfinder to conclude that employer's explanation is merely a
pretext for impermissible retaliation." *Cifra*, 252 F.3d at 216;
*Richardson v. New York State Department of Correctional Service*,
180 F.3d 426, 443 (2d Cir.1999); *Gallagher v. Delaney*, 139 F.3d
at 349. "Although the presumption of discrimination 'drops out of
the picture' once the defendant meets its burden of production
(internal citations omitted), the trier of fact may still
consider the evidence establishing the plaintiff's prima facie
case 'and inferences properly drawn therefrom . . . on the issue
of whether the defendant's explanation is pretextual.'" *Reeves v.
Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000;
*Burdine*, at 255, n. 10. Furthermore, plaintiff  "is not required
to show that the employer's proffered reasons were false or
played no role in the employment decision, but only that they
were not the only reasons and that the prohibited factor was at
least one of the 'motivating' factors." *Cronin*, 46 F.3d at 203.

After plaintiff has made his prima facie case and defendant
has offered a non-discriminatory reason, what usually remains is
a question of fact to be resolved by a fact-finder at trial.
*Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir.
2000). *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d
Cir.1995); *Chambers*, 43 F.3d at 38. "Summary judgment is
appropriate at this point only if the employer's

nondiscriminatory reason is dispositive and forecloses any issue of material fact." *Id.*

Plaintiff has offered no reason to suggest that Con Ed's proffered reasons are a pretext. Plaintiff argues that he had a good record before he complained of discrimination, but that after his first complaint to Boland the retaliation began. However, after Cunningham's first complaint to Boland he received several positive evaluations from supervisor Lew, and in fact, was promoted by supervisor Lew.

Plaintiff himself admits that he returned to the yard late and failed to check out on June 12, 2001, the day he was docked. He admits that he threatened his co-worker Otero, and said he would "fuck him up." He admits that he was twice suspended. He admits that he sent an e-mail to Watson suggesting that he refrain from making foolish statements, an e-mail to Supervisor Silva stating, "I'll wait for your fabrication" and an e-mail to Kieran calling him a lackey. Cunningham does not dispute that after shutting down a project for safety concerns he refused to speak to Environment, Health and Safety employee Greg Rucco and refused to speak with Supervisor Dave Mavrovic. Cunningham also admits that he refused to attend a meeting when told to do so by Supervisor Ronnie Linton and refused to speak with Con Ed Human resources Representative David Burke. Moreover, Cunningham has not presented any evidence to refute the defendant's statements

that he was hostile and abusive to his co-workers and supervisors and that he made himself unpopular by repeated references to his superiority and education level. Accordingly, plaintiff has not come forward with evidence sufficient to persuade a reasonable juror that defendant's non-discriminatory reasons for its actions were a pretext.

CONCLUSION

For the reasons set forth above defendant's motion for summary judgment is granted.

The clerk is directed to transmit a copy of the within to the parties and the Magistrate.


Dated :    Brooklyn, New York
           March 28, 2006




By: /s/ Charles P. Sifton (electronically signed)
    United States District Judge